## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------ x
In re:                                   :   Chapter 11
                                         :
BLUE TULIP CORPORATION,                  :   Case No. 09-10015 (KG)
a Delaware corporation,                  :
                                         :
                                         :
            Debtor.¹                     :   Hearing Date: Time to Be Determined
                                         :   Obj. Deadline:  Time to Be Determined
------------------------------------------------------ x
```

## MOTION OF THE DEBTOR FOR AN ORDER:
## (I) AUTHORIZING AND APPROVING (A) THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES, AND (B) THE CONDUCT OF GOING OUT OF BUSINESS, STORE CLOSING OR SIMILAR THEMED SALES; (II) AUTHORIZING THE DEBTOR TO ASSUME THE CONSULTING AGREEMENT; (III) AUTHORIZING THE BONUS AND INCENTIVE PAYMENTS; AND (IV) GRANTING RELATED RELIEF

Blue Tulip, Inc., the debtor and debtor in possession in the above case (the "Debtor"), hereby moves the Court (the "Motion"), for entry of an order, substantially in the form annexed hereto (the "Order"), pursuant to sections 105(a), 363, 365 and 554 of title 11 of the United States Code (the "Bankruptcy Code"), (i) authorizing the Debtor to (A) sell substantially all of its assets free and clear of all liens, claims and encumbrances, and (B) conduct going-out-of-business, store closing or similar themed sales in accordance with the terms of the store closing sale guidelines (the "Sale Guidelines") annexed as Exhibit B to the Order, (ii) authorizing the assumption of the Consulting Agreement dated as of December 29, 2008 (the "Consulting Agreement") by and between the Debtor and Hilco Merchant Resources, LLC ("Hilco" or the "Consultant") a copy of which is annexed as Exhibit A to the Order; (iii) authorizing the Debtor to pay, in its sole and absolute discretion, Bonus and Incentive Payments; and (iv) granting such other related relief as may be appropriate.  In support of this Motion, the Debtor relies on the Declaration

---

¹ The last four digits of the Debtor's tax identification number are (1905) and its headquarters are located at 401 Bordentown Hedding Road, Bordentown, New Jersey  08505.

of Patrick Farrell in Support of Chapter 11 Petition and First Day Relief.  In further support of this

Motion, the Debtor respectfully represents as follows:

## PRELIMINARY STATEMENT[2]

1.      Prior to the Petition Date and after exploring alternative strategies to

maximize value, the Debtor determined that the only available option to maximize value for its

creditors and estate was to enter into a Consulting Agreement with a national liquidation firm to

obtain immediate assistance in liquidating its inventory by conducting customary store sales and,

upon Court approval, going out of business sales.  In consultation with the Consultant, the Debtor

determined that maximum value would be obtained if it liquidated its merchandise inventory,

vacated each of its Store Locations, and surrendered the premises at each of the Store Locations,

before the end of January 2009.  The Debtor believes that this strategy, if successfully

implemented, will both maximize the value of its estate and reduce the administrative expense of

operating at the Store Locations, including the payment of rent and store-level overhead—the most

significant operating expenses of the estate—into the month of February.  The Debtor also believes

that it is in the best interest of the estate to sell its remaining non-merchandise assets once those

assets are deemed no longer necessary to the conduct of the Store Closing Sales and the

administration of this case.

2.      The Debtor believes that any delay in commencing the Store Closing Sales

can significantly diminish the value realized from the Store Closing Sales because of, among other

things, the nature of the Debtor's business, the decline in post-holiday consumer traffic, the

---

[2]      Capitalized terms used in the Preliminary Statement shall have the meanings ascribed to them in other sections of the Motion.

067961.1001

continuing threat that winter storms will disrupt customer travel, and the overall downturn and uncertainty of the current economic climate and its effect on retail sales.

3.      As a necessary component of the Store Closing Sales, the Debtor, after consultation with its advisors, seeks to implement a bonus plan available to full-time employees involved in the Store Closing Sales and an incentive plan for the Debtor's President to align their interest with those of the Debtor in the common pursuit of maximizing value. Without the dedicated and focused assistance of these employees, the Store Closing Sales will not be successful. The proposed bonus and incentive plans are similar to those customary in the industry and a routine part of Store Closing Sales; in the aggregate the Bonus and Incentive Payments will not exceed $50,000.

4.      For the reasons set forth herein, the Debtor submits that (i) the ability to commence the Store Closing Sales, assume the Consulting Agreement, and to take all actions necessary in connection therewith, on or before January 14, 2009, and (ii) obtaining the authority to make the Bonus and Incentive Payments, is critical to maximizing the value of the Store Closing Sales for the benefit of all stakeholders.

## JURISDICTION

5.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of this case and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105(a), 363, 365 and 554 of the Bankruptcy Code and Rules 2002, 2014, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

DB02:7691421.3                                                                                                    067961.1001

## GENERAL BACKGROUND[3]

*General Background*

      6.     On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

      7.     The Debtor continues to operate its business and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner or official committee of unsecured creditors has been appointed in this case.

*Company Background*

      8.     The Debtor is a retailer of gifts and entertainment products, including personalized items, for all personal and holiday occasions operating under the label of Blue Tulip. The concept of Blue Tulip stores was to solve the diverse occasion, invitation, entertaining and gift-giving needs of its customers.  Prior to the Petition Date, the Debtor was headquartered in New York, New York, maintained a corporate office and distribution center in Bordentown, New Jersey and conducted business from 24 stores located in New Jersey (9 stores), Connecticut (5 stores), Massachusetts (3 stores), Pennsylvania (3 stores), New York (2 stores), and Virginia (2 stores). The stores are primarily located in daily use shopping centers and average approximately 4,131 square feet in size.  In addition to its retail stores, the Debtor operated a website at: www.bluetulip.com.

      9.     The economic downturn has severely impacted the present performance of the Debtor and, in turn, its ability to satisfy its debt obligations.  Sales and margins declined at an accelerating rate in 2008 and have put the Debtor in a negative financial position.  As of the

---

[3]     The facts set forth herein are derived from the Declaration of Patrick Farrell in Support of Chapter 11 Petition and First Day Relief, filed concurrently herewith (the "First Day Declaration"), which is incorporated by reference as if fully set forth herein.  Additional background information regarding the Debtor is set forth in the First Day Declaration.

                                                          

Petition Date, the obligation of the Debtor to its secured lenders was approximately $3,451,619.18, including accrued interest. Consequently, the Debtor has determined that the most prudent course of action is to conduct an orderly wind-down of its operations through the present chapter 11 case.

*The Debtor's Leases*

10.    As set forth above, the Debtor conducts its retail operations at twenty-four retail store locations each of which is subject to a real property lease (each a "Retail Lease"). In addition to the Retail Leases, the debtor maintained its corporate headquarters in New York City (the "Headquarters"), which is the subject of the Headquarters Lease, and has a lease (the "DC Lease") for a distribution center with attached corporate offices (collectively, the "Distribution Center") in Bordentown, New Jersey. Prior to the Petition Date, the Debtor ceased operations at its headquarters, vacated the premises and no longer has any use or need for the Headquarters. Additionally, prior to the Petition Date, the Debtor ceased the purchase of inventory and distributed all of the merchandise inventory located in the Distribution Center to the Retail Stores; however, the Debtor still maintains a corporate office in the Distribution Center.

## RELEVANT BACKGROUND

11.    The Debtor's management, as a result of a consistent decline in retail sales in calender year 2008 and the resulting liquidity constraints, began to explore and analyze various strategic opportunities in order to identify available alternatives to meet projected liquidity needs. As more fully set forth in the First Day Declaration, the Debtor explored the opportunities for both an outright sale of the company and a joint-venture or equity transaction with an existing company in the retail market. In addition, the Debtor's contacted a number of firms specializing in retail liquidation to investigate the possibility of divesting some of its lesser performing stores. Ultimately, the Debtor was unable to consummate a transaction with either a strategic or financial partner. Based on those results, the Debtor determined that the best method to maximize the value

5

of its assets was to initiate, as soon as possible, going-out-of-business or similar themed sales (the "Store Closing Sales") in its retail stores (each a "Store Location") and to liquidate its remaining Assets (as defined below) during, and following the conclusion, of the Store Closing Sales.

12.    The Debtor's management explored a number of possibilities regarding the timing and structure of the Store Closing Sales, including whether to conduct the Store Closing Sales themselves or to engage a liquidation firm to enter into a consultant based agreement or to consummate an equity-based deal.  The Debtor received, and ultimately accepted, an offer from Hilco, who had been previously been contacted in connection with the contemplated store divestitures, to serve as consultant in connection with the Store Closing Sales.  After consultation with its advisors and the Consultant, the Debtor determined that it was necessary to commence the Store Closing Sales immediately and to attempt to conclude such sales on or prior to January 31, 2008 in order to maximize value in the period immediately following the winter holiday season and to minimize the accrual of further operating expenses in the month of February.

13.    In order to facilitate the Store Closing Sales, the Debtor and the Consultant entered into the Consulting Agreement.  Pursuant to the Consulting Agreement, the Consultant will advise the Debtor with respect to the sale of the Debtor's merchandise (the "Merchandise") and furniture, fixtures and equipment (the "FF&E", and together with the Merchandise, the "Assets")[4] at the Store Locations.  No inventory will be sold to the Consultant.  Rather, the Consultant will earn a fee based upon the gross recovery from the Debtor's Assets.

14.    The significant terms of the Consulting Agreement are as follows:[5]

---

[4]    The Debtor is also marketing its remaining Assets which are primarily located at the Distribution Center in Bordentown, New Jersey (the "Corporate FF&E").

[5]    The following description of the significant terms of the Consulting Agreement is a summary of the terms of the Consulting Agreement.  Capitalized terms used but not defined in this section shall have the meanings ascribed to

6

(a) <u>Services</u>: The Consultant will serve as an independent consultant to the Debtor in connection with the conduct of the Store Closing Sales and will provide the Debtor with the following Services with respect to the conduct of the Store Closing Sales:

    i.      Provide the Debtor with qualified supervisors engaged by the Consultant as independent contractors to oversee the management of the Store Locations;

    ii.     Determine the appropriate point-of-sale and external advertising for the Store Locations;

    iii.    Determine the appropriate pricing of the Merchandise, staffing levels for the Store Locations, and appropriate bonus and incentive programs for the Store Location's employees;

    iv.    Oversee display of Merchandise for the Store Locations;

    v.     To the extent that information is available, coordinate accounting functions for the Store Locations, including evaluation of the sales of Merchandise by category, sales reporting and monitoring of expenses using the Debtor's infrastructure;

    vi.    Maintain the confidentiality of all propriety or non-public information regarding the Debtor of which the Consultant or its representatives become aware, except for information that is public as of the date of the Consulting Agreement or otherwise becomes public through no fault of the Consultant;

    vii.   Provide such other related service deemed necessary or appropriate by the Debtor and Consultant;

    viii.  Assist the Debtor in connection with managing and controlling loss prevention; and

    ix.   Provide support in obtaining authorization to conduct the Store Closing Sale for state and local authorities, if necessary.

(b) <u>Sale Termination Date</u>:  The Store Closing Sales shall terminate on January 31, 2009 (the "<u>Sale Termination Date</u>") unless otherwise mutually agreed to by the parties to extend such date; <u>provided</u>, that the Consultant may terminate the Store Closing Sale at any particular store prior to the Sale Termination Date.

---

them in the Consulting Agreement.  To the extent that this summary differs in any way from the terms set forth in the Consulting Agreement, the terms of the Consulting Agreement shall control.

DB02:7691421.3                                                                067961.1001

(c)    Store Closing Sales Expenses:

    i.    In connection with the Store Closing Sales, the Debtor shall be responsible for the payment of all expenses incurred in connection with the Store Closing Sales, including without limitation all sale expenses. To control sale expenses, the Consultant has provided the Debtor with an expense budget (the "Expense Budget") of certain items, including payment of the cost of supervision, advertising and other costs. The Expenses Budget may be modified by mutual agreement of the parties.

    ii.    Notwithstanding the terms of the Consulting Agreement, the Consultant has requested, and the Debtor has agreed to provide, an advanced payment each week of the estimated Expense Budget items for such week. Reconciliation of any pre-paid Expense Budget items will be conducted on a weekly basis in accordance with the reconciliation process set forth in the Consulting Agreement.

(d)    Consultant's Fee: The Consultant shall be paid a fee equal to five percent (5%) of the gross sale proceeds related to the Merchandise (the "Fee").

The Debtor and the Lenders have agreed that the Fee and the costs actually incurred by the Consultant for the items set forth in the Expense Budget (as may be amended by mutual agreement), shall be entitled to treatment as a claim pursuant to section 506(c) of the Bankruptcy Code to surcharge against the Lenders' collateral.

(e)    Fixture Disposition: The Consultant shall sell the FF&E in any such Store Locations for the Debtor's benefit. In consideration of providing such services, the Consultant shall be entitled to a commission of twenty percent (20%) of the gross receipts from all sales or other dispositions of FF&E at the Store Locations. In addition, the Debtor shall reimburse the Consultant for the Consultant's reasonable out of pocket expenses incurred in connection with the sale or other disposition of the FF&E pursuant to a budget of budgets to be established from time to time by mutual agreement of the parties.[6]

---

[6]    The Consulting Agreement applies only to the FF&E located in the Store Locations. However, the Debtor requests authorization to retain the Consultant to undertake the sale of the Corporate FF&E on terms no worse than those set forth in the Consulting Agreement, without further order of the Court.

8

(f)     <u>Sale Proceeds; Sale Reconciliation</u>:  On Wednesday of each week, all accounting matters (including without limitation, all amounts reimbursable or payable to the Consultant) shall be reconciled, and the Debtor shall immediately pay to the Consultant, in connection with such weekly settlement, all Fees earned and the cost of items in the Expense Budget for the previous week incurred but not previously advanced (in whole or in part).  Overages will be credited against the current week's expenses.

The parties shall complete a final reconciliation and settlement of all amounts contemplated by the Consulting Agreement (including, without limitation, Expenses Budget items and fees earned pursuant to the Consulting Agreement) no later than thirty (30) days following the Sale Termination Date (as may be extended by agreement).

(g)     <u>Indemnification</u>:

(i)  The Debtor shall indemnify and hold the Consultant and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential co-investors, principals, affiliates and Supervisors (collectively, "<u>Agent Indemnified Parties</u>"), harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from, or related to:  (i) the willful or negligent acts or omissions of the Debtor or its consultants, members, employees, representatives and principals (other than the Agent Indemnified Parties); (ii) the Debtor's breach of any provision of the Consulting Agreement; (iii) any liability or other claims, including without limitation, product liability claims, asserted by customers, any Store employees (under a collective bargaining agreement or other), or any other person (excluding Agent Indemnified Parties) against an Agent Indemnified Party, except claims arising from the Consultant's negligence, intentional acts, or unlawful behavior; and (iv) the Debtor's failure to pay over to the appropriate taxing authority any taxes required to be paid by the Debtor during the GOB Process in accordance with applicable law.

(ii)  The Consultant shall indemnify and hold the Debtor and its officers, directors, principals, members, consultants and employees (collectively, "<u>Agent Indemnified Parties</u>") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from, or related to:  (i) the willful or negligent acts or omissions of the Consultant or its consultants, members, employees, representatives, principals and Supervisors; (ii) the breach of any provision of, or failure to perform any obligation under, the Consulting Agreement by the Consultant; (iii) any liability or other claims made by the Consultant's

9

     

consultants, members, employees, representatives, principals and
Supervisors or any other person (excluding Merchant Indemnified
Parties) against a Merchant Indemnified Party arising out of or
related to the Consultant's conduct of the Store Closing Sales, except
claims arising from the Debtor's negligence, intentional acts or
unlawful behavior.

## RELIEF REQUESTED

15.    By this Motion, the Debtor, pursuant to sections 105(a), 363, 365 and 554 of

the Bankruptcy Code,[7] request entry of the Order (i) authorizing the Debtor to sell the Assets free

and clear of all liens, claims and encumbrances; (ii) authorizing the Debtor to conduct the Store

Closing Sales in accordance with the terms of the Sale Guidelines; (iii) authorizing the assumption

of the Consulting Agreement; (iv) authorizing the Debtor to make the Bonus and Incentive

Payments, in its sole discretion; and (v) granting such other related relief as may be appropriate.

## BASIS FOR RELIEF REQUESTED

### I.    Authorizing the Sale of the Assets and the Store Closing Sales

16.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a

debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary

course of business, property of the estate." 11 U.S.C. § 363(b)(1); see also In re Ames Dep't

Stores, Inc., 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (holding that going-out-of-business sales

are governed by section 363(b)).

17.    To obtain court approval to use property under section 363(b) of the

Bankruptcy Code for the purpose of a store closing sale, the Debtor must articulate a business

reason for the proposed sale. See e.g., Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir.

---

[7]    The Debtor submits that approval of the Consulting Agreement is appropriate under sections 105(a) 363, 365
and 554 of the Bankruptcy Code. However, to the extent the Court believes that it is necessary to approve the
Consulting Agreement under sections 327 and 328 of the Bankruptcy Code, then the Debtor respectfully requests that
this Motion be treated as a request for relief pursuant to sections 327 and 328 of the Bankruptcy Code.

067961.1001

1996) (citing Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 515 (7th Cir. 1991));

Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070-71 (2d

Cir. 1983); In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986) (implicitly

adopting the "sound business judgment" test of Lionel Corp. and requiring good faith); In re

Delaware & Hudson Ry. Co., 124 B.R. 169, 175-76 (D. Del.1991) (concluding that the Third

Circuit adopted the "sound business judgment" test in the Abbotts Dairies decision); Dai-Ichi

Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.),

242 B.R. 147, 153 (D. Del. 1999) (same).  When a valid business justification exists, the law vests

the debtor's decision to use its property with a strong presumption "that in making a business

decision[,] the directors of a corporation acted on an informed basis, in good faith and in the honest

belief that the action taken was in the best interests of the company."  Official Comm. of

Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656

(S.D.N.Y. 1990) (holding that the Delaware business judgment rule has "vitality by analogy" in

Chapter 11, especially where the debtor is a Delaware corporation) (quotations omitted).

   18. Here, more than ample business justification exists to approve the proposed

Store Closing Sales pursuant to the Sale Guidelines on an expedited basis.  The Debtor thoroughly

analyzed its operations and finances and determined that conducting the Store Closing Sales, as

soon as possible, and selling the Assets are in the best interests of the Debtor, its estate, creditors

and parties in interest.

   19. To maximize the recovery from the Store Closing Sales, it is essential that

the Debtor has maximum customer traffic in the Store Locations, especially during the early days

and weeks of the Store Closing Sales.  Now presents the only opportunity to maximize the value of

the Assets, in light of the Debtor's mounting liquidity issues.  Because of the poor state of the

11

economy in general, the severe downtown in consumer spending and its resulting negative effect on sales, the decline in customer traffic as the retail market moves away from the holiday selling season, and the threat of inclement winter weather where the Store Locations are, time is of the essence if the Debtor is to receive maximum value for its Assets.  Accordingly, the Debtor, in consultation with its advisors, determined that commencing Store Closing Sales immediately after obtaining Court approval will maximize the value of the Assets and should allow the Debtor to drastically reduce operating expenses is the Store Closing Sales conclude by January 31, 2009.  Accordingly, approval of the Store Closing Sales in accordance with the Sale Guidelines on or before January 14, 2008 is (i) in the best interests of the Debtor, its estate, creditors and parties in interest, and (ii) necessary to maximize the value of the Debtor's estate for the benefit of its stakeholders.

20.     Store closing or liquidation sales are a routine occurrence in chapter 11 cases involving retail debtors.  See In re Ames Dep't Stores, Inc., 136 B.R. at 359 (holding that "going-out-of-business" sales are an important part of "overriding federal policy requiring [a] debtor to maximize estate assets").  In fact, the disposition of the Assets in accordance with the Sale Guidelines represents an accepted method for the sale of assets that has been approved previously in other cases in this District.  See, e.g., In re KB Toys, Inc., Case No. 09-13269 (KJC) (Bankr. D. Del. Dec. 18, 2008) (approving store closing sales pursuant to sale guidelines); In re Whitehall Jewelers Holdings, Inc., Ch. 11 Case No. 08-11261 (KG) (Bankr. D. Del. Aug. 8, 2008) (same); In re Goody's Family Clothing, Inc., Ch. 11 Case No. 08-11133 (CSS) (Bankr. D. Del. June 13, 2008) (same); In re Linens Holding Co., Ch. 11 Case No. 08-10832 (CSS) (Bankr. D. Del. May 30, 2008) (same); and In re Sharper Image Corp., Ch. 11 Case No. 08-10322 (KG) (Bankr. D. Del. May 30, 2008) (same).

21.     At the conclusion of the Store Closing Sales, the Debtor's business

operations will be substantially complete and the only remaining tasks left for the Debtor's

management will be the wind-down of the Debtor's corporate affairs and the distribution of estate

assets to the Debtor's creditors.  Accordingly, by this Motion, the Debtor also seeks authority to

sell the Corporate FF&E, as well as any remaining Assets, as soon as such assets are no longer

essential to the Store Closing Sales and the conduct of this case.  Because these assets will no

longer be essential to the Debtor or its estate, the Debtor submits that the ability to promptly

monetize these assets as soon as practicable is an exercise of its sound business judgment and is in

the best interest of its estate and creditors.  The Debtor intends to market the Corporate FF&E on

its own, but reserves the right to request that the Consultant dispose of a portion or all of the

remaining Assets, on terms no worse than those set forth in the Consulting Agreement with respect

to the FF&E located at the Store Locations.[8]

A.     Approving Sale of Assets Free and Clear of All Encumbrances

22.     The Debtor requests approval to sell the Assets on a final "as is" basis, free

and clear of any and all liens, claims and encumbrances (collectively, the "Liens") in accordance

with section 363(f) of the Bankruptcy Code with any Liens in such Assets attaching to the proceeds

in the order or priority and with the same force, validity and effect they had with respect to the

Assets prior to the sale.  A debtor in possession may sell property under sections 363(b) and 363(f)

"free and clear of any interest in such property of an entity other than the estate" if any one of the

following conditions is satisfied:

---

[8]     To the extent that the Debtor is unable to sell certain of the Merchandise or FF&E at the Store Locations by
the Sale Termination Date (as may be extended) the Debtor seeks authority to abandon such assets pursuant to section
554(a).  The Debtor submits that those assets at the Store Location which are not sold during the Store Closing Sales
will have little to no value to the estate, and abandonment of such Assets is proper.

13

1)      applicable non-bankruptcy law permits sale of such property free and clear of such interest;

2)      such entity consents;

3)      such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

4)      such interest is in bona fide dispute; or

5)      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); Citicorp. Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that since section 363(f) is written in the disjunctive, the court may approve a sale free and clear if any one subsection is met).

23.      The Debtor believes that the sale of the Assets pursuant to the terms of the Sale Guidelines will satisfy one or more of the section 363(f) requirements. The Debtor's Lenders have consented to the Store Closing Sales and the sale of the Assets. Thus, the sale of the Assets, with respect to the Lenders' collateral is authorized pursuant to section 363(f)(2) of the Bankruptcy Code. Second, as the obligations to the Debtor's Lenders, or any other person which may assert a lien on or claim against the property being sold, can be satisfied by the payment of money, the Assets can be sold free and clear pursuant to section 363(f)(5) of the Bankruptcy Code.

B.      Approving the Sale Guidelines in Connection with the Store Closing Sales

24.      As a necessary part of this process, the Debtor requests the authority to conduct the Store Closing Sales in accordance with the customary Sale Guidelines and without complying with applicable state and local laws, statutes, rules and/or ordinances governing store closing, liquidation or "going-out-of-business" sales, except for such laws, statutes, rules or ordinances which are for the protection of the health and safety of the public and consumer protection laws. The Debtor intends to comply with the state and local health and safety laws and

14

consumer protection laws in conducting the Store Closing Sales. However, many state and local

laws, statutes, rules and ordinances require special and cumbersome licenses, waiting periods, time

limits and other procedures for store closing, liquidation or similar sales. To eliminate the time,

delay and expense associated with the administrative procedures necessary for non-bankruptcy

sales, the Debtor requests that the Court expressly authorize the Store Closing Sales in accordance

with the Sale Guidelines. By virtue of 28 U.S.C. § 1334, this Court has exclusive jurisdiction over

the Debtor's property wherever located. 28 U.S.C. § 1334. In the context of bankruptcy cases,

therefore, since creditors receive notice of the proposed sale, as well as opportunity to be heard in

this Court, enforcement of such statutes and regulations is redundant and unnecessary.

   25. The Bankruptcy Code preempts state and local laws that conflict with its

underlying policies. See Belculfine v. Aloe (In re Shenango Group, Inc.), 186 B.R. 623, 628

(Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal

obligations pursuant to the bankruptcy code ... [A] state statute cannot place burdens on them

where the result would contradict the priorities established by the federal bankruptcy code."), aff'd,

112 F.3d 633 (3d Cir. 1997). While preemption of state law is not always appropriate, see Baker &

Drake, Inc. v. Public Serv. Comm'n of Nev. (In re Baker & Drake, Inc.), 35 F.3d 1348, 1353-54

(9th Cir. 1994) (holding that Bankruptcy Code did not preempt state law prohibiting taxicab

leasing that was promulgated in part as public safety measure), preemption is appropriate where, as

here, the only state laws involved concern economic regulation rather than the protection of public

health and safety.[9]  See id. at 1353 (finding that "federal bankruptcy preemption is more

likely...where a state statute is concerned with economic regulation rather than with protecting the

---

[9] The Debtor will comply with applicable state and local public health and safety laws ("Safety Laws"), and applicable tax, labor, employment, environmental, and consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, the "General Laws").

                  

public health and safety"); see also In re Scott Housing Sys. Inc., 91 B.R. 190, 196-97 (Bankr. S.D. Ga. 1988) (holding that automatic stay under Section 362 is broad and preempts state law except for those laws designed to protect public health and safety).

26.     Here, state and local licensing requirements, time limits or other restrictions on liquidation sales would undermine the fundamental purpose of section 363(b) of the Bankruptcy Code by placing constraints on the Debtor's ability to marshal and maximize the value of the Assets.  Accordingly, authorizing the Store Closing Sales in accordance with the Sale Guidelines without the delays and burdens associated with obtaining various state and local licenses, observing state and local waiting periods or time limits, and/or satisfying any additional requirements with respect to advertising and the like is necessary and appropriate.  Moreover, the delays inherent in satisfying such requirements will no doubt force the Debtor into paying an additional month of rent and overhead for each of the Store Locations, as well as foist significant administrative expenses upon the Debtor to satisfy the requirements of the various states, counties and municipalities in which the Debtor operates.

27.     It is also necessary that any action by any lessor or any federal, state or local agency, department or governmental authority or any other entity to prevent, interfere with or otherwise hinder consummation of the Store Closing Sales or advertisement of such sales be enjoined.  See Missouri v. U.S. Bankruptcy Court, 647 F.2d 768, 776 (8th Cir. 1981), cert. denied, 454 U.S. 1162 (1982) (holding that attempt to enforce state regulations governing liquidation of grain warehouses directly conflicted with bankruptcy court's control over property of debtor's estate and therefore violated automatic stay).

28.     The requested waiver is narrowly tailored to facilitate the successful consummation of the Store Closing Sales.  The Debtor does not seek a general waiver of all state

and local requirements, but only those that apply specifically to liquidation sales.  As noted above, the Debtor fully intends to be bound by and comply with all General and Safety Laws.

29.     Similar relief has been granted in numerous bankruptcy cases in this District. See e.g., In re KB Toys, Inc., supra (final order authorizing debtor to continue store closing sales pursuant to store closing agreement); In re NWL Holdings, Inc., Case No. 08-12487 (MFW) (Bankr. D. Del. Dec. Dec. 9, 2008) (same); In re Sharper Image Corp., supra (same).

C.     Approving Waiver of Any Lease Restrictions that May Negatively Impact the Debtor's Ability to Conduct the Store Closing Sales

30.     Because the Debtor regularly conducts "sales" at the Store Locations, the Debtor does not believe that the Store Closing Sales should interfere with lease provisions that are intended to protect the image of a shopping center, mall or other location or avoid disruption of normal commerce.  Nonetheless, certain of the leases governing the premises of the Store Locations (collectively, the "Leases") may contain provisions purporting to restrict or prohibit the Debtor from conducting store closing, liquidation, or similar sales.  Such provisions have been held to be unenforceable in chapter 11 cases as they constitute an impermissible restraint on a debtor's ability to properly administer its case and maximize the value of its assets under section 363 of the Bankruptcy Code.  See, e.g., In re Ames Dep't Stores, Inc., 136 B.R. at 359 (holding that enforcement of such lease restrictions would "contravene overriding federal policy requiring debtor to maximize estate assets…"); In re R. H. Macy and Co., Inc., 170 B.R. 69, 73-74 (Bankr. S.D.N.Y. 1994) (holding that the lessor could not recover damages for breach of a covenant to stay open because the debtor had a duty to maximize the value of the estate and the debtor fulfilled this obligation by holding a store closing sale and closing the store); In re Tobago Bay Trading Co., 112 B.R. 463, 467-68 (Bankr. N.D. Ga. 1990) (finding that a debtor's efforts to reorganize would be significantly impaired to the detriment of creditors if lease provisions prohibiting a debtor from

liquidating its inventory were enforced); In re Lisbon Shops, Inc., 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in Chapter 11 case where debtor sought to conduct going-out-of-business sale).

31.     As such, to the extent that such provisions or restrictions exist in any of the Leases for the Store Locations, such landlords may not interfere with or otherwise seek to restrict the Debtor from conducting the Store Closing Sales.  Accordingly, the Debtor requests that the Court authorize the Debtor to conduct the Store Closing Sales without interference by any landlords or other persons affected, directly or indirectly, by the Store Closing Sales.

32.     Bankruptcy courts in this District have held that restrictive lease provisions affecting store closing sales in chapter 11 cases unenforceable.  See, e.g., In re Tweeter Home Entm't Group, Inc., supra (final order authorizing debtor to continue store closing sales pursuant to store closing agreement); In re Three A's Holdings, L.L.C., Ch. 11 Case No. 06-10886 (BLS) (Bankr. D. Del. Sept. 25, 2006) (order authorizing, among other things, agent to conduct store closing sales).

33.     The Sale Guidelines are substantially similar to sale guidelines approved in connection with store closing sales approved by bankruptcy courts in this District.  See, e.g., In re Whitehall Jewelers Holdings, Inc., Ch. 11 Case No. 08-11261 (KG) (Bankr. D. Del. Aug. 8, 2008) (approving store closing sales pursuant to sale guidelines); In re Goody's Family Clothing, Inc., Ch. 11 Case No. 08-11133 (CSS) (Bankr. D. Del. June 13, 2008) (same); In re Linens Holding Co., Ch. 11 Case No. 08-10832 (CSS) (Bankr. D. Del. May 30, 2008) (same); and In re Sharper Image Corp., Ch. 11 Case No. 08-10322 (KG) (Bankr. D. Del. May 30, 2008) (same).  The Sale Guidelines, like the sale guidelines approved in the cases cited herein, provide the appropriate protections to any legitimate concerns that landlords might otherwise have concerning the conduct

18

of the Store Closing Sales.  Accordingly, for the reasons set forth above, the Debtor believes that

the conduct of the Store Closing Sales pursuant to the terms of the Sale Guidelines is the most

efficient means of preserving and maximizing the value of the Assets for the benefit of their

stakeholders.

## II.   <u>Authorizing the Assumption of the Consulting Agreement</u>

34.   Section 105(a) of the Bankruptcy Code provides that the Court "may issue

any order, process or judgment that is necessary or appropriate to carry out the provisions of this

title."  11 U.S.C. § 105(a).

35.   Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a

debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary

course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Although section 363 of the

Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to

authorize the disposition of a debtor's assets prior to confirmation of a plan, courts in this Circuit

and others, in applying section 363, have required that the decision to sell assets outside the

ordinary course of business be based upon the debtor's sound business judgment and a finding of

"good faith."  <u>See</u> <u>In re Abbotts Dairies of Pennsylvania, Inc.</u>, 788 F.2d 143, 149-50 (3d Cir. 1986)

(requiring a finding of "good faith" to approve a sale under section 363(b)); <u>Dai-Ichi Kangyo</u>

<u>Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)</u>, 242

B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of

property under [section 363(b)], courts require the debtor to show that a sound business purpose

justifies such actions."); <u>In re Delaware & Hudson Ry. Co.</u>, 124 B.R. 169, 176 (D. Del. 1991)

(examining the history of the standard required for a pre-confirmation sale of assets under section

363(b) and opining that the Third Circuit has implicitly abandoned the "emergency" test under

earlier precedent and has adopted the "sound business judgment" test as utilized by other courts).

36.     Additionally, section 365(a) of the Bankruptcy Code authorizes a debtor in

possession to assume an executory contract subject to the bankruptcy court's approval.  11 U.S.C. §

365(a).  Section 365(b) of the Bankruptcy Code requires a debtor in possession to satisfy certain

requirements at the time of assumption if a default exists under the subject contract, lease or

agreement to be assumed.  11 U.S.C. § 365(b) (requiring the curing of any defaults and provision

of adequate assurance as a condition to assumption of an unexpired lease).

37.     In the Third Circuit, courts apply the business judgment rule to determine

whether a debtor's decision to assume an executory contract or unexpired lease should be

approved.  See, e.g., Sharon Steel Corp. v. National Fuel Gas Distrib. Corp. (In re Sharon Steel

Corp.), 872 F.2d 36, 40 (3d Cir. 1989); NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984)

(describing the business judgment test as the "traditional" test); In re III Enterprises, Inc. V, 163

B.R. 453, 469 (Bankr. E.D. Pa. 1994) (citations omitted) ("Generally, a court will give great

deference to a debtor's decision to assume or reject the contract.  A debtor need only show that its

decision to assume or reject the contract is an exercise of sound business judgment – a standard

which we have concluded many times is not difficult to meet.").  So long as assumption of the

contract or lease is an exercise of the debtor's sound business judgment and the debtor otherwise

satisfies the requirements of section 365(b), the assumption should be approved.  See In re Sharon

Steel Corp., 872 F.2d at 40.

38.     The Debtor's decision to assume the Consulting Agreement is a reasonable

exercise of its business judgment.  To avoid immediate and irreparable harm to the estate by

compromising the Debtor's efforts to maximize the value of the Assets through the Store Closing

Sales, the Debtor determined it was necessary to hire a national liquidator with significant experience in a large-scale liquidation. At the conclusion of its marketing efforts, the only firm offer the Debtor ultimately received was from the Consultant to perform the Store Closing Sales. The Debtor engaged in good-faith arm's length negotiations with the Consultant regarding the terms of the Consulting Agreement. The Debtor believes that the terms of the Consulting Agreement are fair and reasonable and are designed to maximize the value of the Assets.

39.     The Consultant has extensive expertise in conducting going-out-of-business sales and can oversee, and assist in the management and implementation of, the Store Closing Sales in an efficient and cost effective manner. Assumption of the Consulting Agreement will enable the Debtor to utilize the experience, skills and resources of the Consultant to effectively and efficiently conduct the Store Closing Sales and, thus, significantly improve the potential value to be received through the Store Closing Sales for the benefit of all stakeholders.

40.     Accordingly, for the foregoing reasons, the Debtor requests that the Court authorize the assumption of the Consulting Agreement under section 365 of the Bankruptcy Code.

## III.   Authorizing Payment of Bonus and Incentive Payments

41.     The Debtor has set aside a pool of $50,000 to be used (i) to make bonus payments (each a "Bonus Payment"), in the Debtor's sole discretion, to the Debtor's full-time employees whose efforts in connection with the Store Closing Sales serve to maximize the value of the Debtor's estate and whose efforts have a salutary effect on the Store Closing Sales; and (ii) make incentive payments (the "Incentive Payments" and together with the Bonus Payments, collectively, the "Bonus and Incentive Payments") to Patrick Farrell, the Debtor's President and Chief Financial Officer, to ensure that Mr. Farrell's efforts and attention are aligned with the

21

estate's and are focused on both maximizing the value of the Assets and on reducing the administrative costs to the estate.

42.     The Bonus Payments.  Section 363(c) of the Bankruptcy Code permits a debtor to "use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c).  In the retail industry, it is ordinary course to pay store closing bonuses for employees making substantial contributions to a company's liquidation efforts.  Additionally, the Debtor believes that making the Bonus Payments will not subject any of its creditors to an unusual risk because the Bonus Payments will only be made to employees making a significant contribution to the Store Closing Sales and who, therefore, provide value to the estate in excess of what would otherwise be obtained.  The Debtor believes that making the proposed Bonus Payments to employees meeting this criteria, in the Debtor's sole discretion, constitutes an ordinary course transaction for which no Court approval is needed.

43.     Even if this Court finds that the bonuses do not constitute an ordinary course business practice within the scope of section 363(c) of the Bankruptcy Code, this Court also has authority, pursuant to sections 105 and 363(b) of the Bankruptcy Code, to authorize the Debtor to make Bonus Payments.  Under section 105(a) of the Bankruptcy Code, the Court has expansive equitable powers to fashion any order or decree that is in the interest of preserving or protecting the value of a debtor's assets.  See, e.g., In re Chinichian, 784 F.2d 1440, 1443 (9th Cir. 1986) (stating that "[s]ection 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code").  Similarly, the payment of bonuses outside of the ordinary course of business should be approved when there is a sound business purpose that justifies such action.  See In re Martin, 91 F.3d at 395; In re Montgomery Ward Holding Corp., 242 B.R. at 153.  Making the Bonus Payment in connection with the Store Closing Sales will

accomplish a sound business purpose and aid in maximizing the value of the Debtor's estate for the benefit of its stakeholders by inducing employees who are needed to manage and complete the Store Closing Sale process to remain in the employ of the Debtor and to give the effort needed to maximize the return from such sales.

44.     To that end, the Debtor has established a bonus pool of $30,000 to fund the proposed Bonus Payments.  The Debtor intends to evaluate the job performance of each of its full-time employees in connection with the Store Closing Sales.  For those parties who have expended considerable effort and have contributed to maximizing the value of the Assets, the Debtor proposes to make a Bonus Payment, in an amount to be determined, to such employees, in the Debtor's sole discretion.

45.     The Incentive Payments.  In addition to the Bonus Payments, the Debtor intends to establish an incentive plan for its senior executive, Mr. Farrell.  The Debtor has designed a plan to provide incentive to Mr. Farrell to provide maximum effort and commitment to obtaining the greatest value from the Assets for the benefit of the Debtor's creditors.  The Debtor submits that the plan proposed herein will align the interests of Mr. Farrell with those of the Debtor in this case.  The focus of the plan is two fold.  First, the Debtor aims to minimize the administrative cost of this case, and has determined that the costs associated with the maintenance of the Store Locations, including payment of rent, is a significant costs to the estate which can, nevertheless, be mitigated.  To that end, the Debtor has proposed providing Mr. Farrell with an Incentive Payment if he is able to complete the Store Closing Sales on or prior to January 31, 2009, in order to avoid an additional month's occupancy of the Store Locations.  Second, the Debtor's goal for the Store Closing Sales is to monetize its Assets in an efficient manner that will provide the estate with the highest dollar recovery therefrom.  Accordingly, if the Cash Receipts (as set forth in the Cash

Collateral Budget) exceed the Total Operating Disbursements (as set forth in the Cash Collateral

Budget) during the Store Closing Sales by an amount within ten (10%) percent of, or an amount

greater than, $559,914.89, Mr. Farrell will be entitled to a separate Incentive Payment.  Under the

Debtor's proposed plan each Incentive Payment will be equal to $10,000.

      46.     The Debtor submits that the Incentive Payments reflect an exercise of sound

business judgment, and will generate significant value to the estate in excess of the amount of the

payments themselves.  Moreover, the Debtor believes that the proposed Incentive Payments will

serve as the proper incentive for Mr. Farrell to accomplish the twin goals of this case:  to minimize

administrative costs, and to maximize asset value—the combination of which will inure to the

benefit of the Debtor's creditors.  Accordingly, the Debtor submits that authorizing the Incentive

Payments on the terms set forth herein should be approved pursuant to section 363(b).

      47.     The Debtor also submits that the Incentive Payments are not prohibited

under section 503(c)(3)[10] of the Bankruptcy Code because the Incentive Payments are justified by

the "facts and circumstances" of this case.  Since courts have begun to analyze various payments

under section 503(c)(3), they have been unanimous in holding that they must use the "business

judgment" standard as the proper standard for determining whether incentive programs and the

payments thereunder are justified.  See, e.g., In re Werner Holding Co. (DE). Inc., Case No. 06-

10578 (Carey, J.) (Bankr. D. Del. July 20, 2006, August 22, 2006, and December 20, 2006); In re

Nobex Corporation, No. 05-20050 (Walrath, C.J.) (Bankr. D. Del. May 15, 2006 and Dec. 21,

2005); In re Riverstone Networks. Inc., No. 06-10110 (Sontchi, J.) (Bankr. D. Del. March 28,

---

[10]     Because the Incentive Payments are not (i) retentive in nature or (ii) severance payments, sections 503(c)(1) and (2), respectively, do not apply. See 11 U.S.C. § 503(c).

        

2006); In re Pliant Corporation, No. 06-100001 (Walrath, C.J.) (Bankr. D. Del. March 14, 2006).

Indeed, in the Nobex case, the Court stated that:

> [Section] (c)(3) was meant to provide a standard, albeit not as clear, for any
> other transfers or obligations outside the ordinary course of business.... I read
> (c)(3) to be the catch-all and the standard under (c)(3) for any transfers or
> obligations made outside the ordinary course of business are those that are
> justified by the facts and circumstances of the case.... I find it quite frankly
> nothing more than a reiteration of the standard under 363 ... under which
> courts had previously authorized transfers outside the ordinary course of
> business and that [are], based on the business judgment of the debtor....

In re Nobex Corp., Case No. 05-20050 (Walrath, C.J.) (Bankr. D. Del. January 12, 2006, Hearing Tr.

at 86-87) (order approving the management Plan at issue entered January 20, 2006).

48.     As set forth above, the payments of the Incentive Payments to Mr. Farrell are

will within the exercise of the Debtor's business judgment. The Debtor is in a position where it

must monetize its assets quickly so that the continuing costs of maintaining the Store Locations do

not cannibalize the proceeds obtained from the Store Closing Sales. However, the Debtor must do

so in a manner that will obtain maximum value from the Assets. The Debtor submits that the

Incentive Payments, subject to the conditions set forth herein, are narrowly tailored to ensure that

Mr. Farrell works towards accomplishing these aims. Importantly, the Incentive Payments focus on

reducing the overall administrative cost of administering these cases—by seeking to eliminate the

Debtor's leasehold obligations by the end of January—and maximizing the value of the Debtor's

Assets—by rewarding Mr. Farrell for achieving significant overall recovery from the Store Closing

Sales. Accordingly, the Debtor submits that the Incentive Payments are a sound exercise of its

business judgment, will ultimately lead to maximum recovery to the estate and are in the best

interest of the Debtor's estate and its creditors.

DB02:7691421.3                                                          067961.1001

## REQUEST FOR WAIVER OF STAY

49.    The Debtor requests a waiver of any stay of the effectiveness of the order approving the relief requested in this Motion.  Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."  Given the harm to the estate if the Debtor cannot conduct these sales immediately upon approval of the Motion and complete such sales prior to the end of January 2009, as anticipated, the Debtor believes it is in its best interest to commence the Store Closing Sales on or before January 14, 2009.  Accordingly, the Debtor submits that more than ample cause exists to justify a waiver of the ten-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), to the extent that they apply.

## NOTICE

50.    Notice of this Motion will be provided to: (i) the Office of the United States Trustee; (ii) the Debtor's twenty (20) largest unsecured creditors on a consolidated basis; (iii) counsel to the Debtor's prepetition secured lenders; (iv) all parties known to be asserting a lien in the Assets; (v) each of the Debtor's landlords; (vi) the State Attorney General's offices (upon (x) Chief or Director of the Consumer Protection Division or Bureau; and (y) Chief or Director of the Bankruptcy Division or Bureau) and State Consumer Protection Agency for each State where a Store Location is; (vii) the local mayor or similar representative of each village, or city official, and the county or parish for each Store Location, addressed to the attention of the municipal, city or county attorney, in each case to the consumer protection division; (viii) various federal and state tax and regulatory authorities; and (ix) all entities requesting notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is necessary.

DB02:7691421.3                                                                    067961.1001

## CONCLUSION

WHEREFORE, the Debtor respectfully requests entry of the Order, in substantially the form annexed hereto as <u>Exhibit I</u>; and (ii) such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware
      January 5, 2009

YOUNG CONAWAY STARGATT & TAYLOR, LLP


    /s/ Ryan M. Bartley

James L. Patton, Jr.(No. 2202)
Sean M. Beach (No. 4070)
Ryan M. Bartley (No. 4985)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Proposed Counsel for the Debtor and
Debtor-in-Possession

27

DB02:7691421.3

067961.1001